UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------X
SAMUEL ALICEA,

                Plaintiff,

       -against-

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

               Defendant.
-----------------------------------------------------X

**REPORT AND
RECOMMENDATION**

14 Civ. 1998 (CS) (PED)

TO THE HONORABLE CATHY SEIBEL, United States District Judge:

# I.  INTRODUCTION

Plaintiff Samuel Alicea brings this action pursuant to 42 U.S.C. § 405(g) challenging the decision of the Commissioner of Social Security (the "Commissioner") denying his application for benefits on the ground that he is not disabled within the meaning of the Social Security Act (the "SSA"), 42 U.S.C. §§ 423 *et seq.*  The matter is before me pursuant to an Order of Reference entered October 22, 2014 (Dkt. #8).  Presently before this Court are the parties' cross-motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure (Dkt. #17 (defendant's motion), #18 (defendant's memorandum of law), #19 (plaintiff's motion) and #20 (plaintiff's memorandum of law)).  For the reasons set forth below, I respectfully recommend that defendant's motion be **DENIED**, that plaintiff's motion be **GRANTED** and the case **REMANDED** pursuant to 42 U.S.C. § 405(g), sentence four, for further administrative proceedings.

## II. BACKGROUND

The following facts are taken from the administrative record ("R.") of the Social Security Administration (Dkt. #7), filed by defendant in conjunction with the Answer (Dkt. #6).

A. Application History

Plaintiff was born on September 11, 1968. R. 118, 127. On or about May 25, 2011, plaintiff applied for Supplemental Security Income ("SSI") and disability insurance benefits, alleging that he had been disabled since December 2, 2009 due to coronary artery disease (which resulted in the placement of a stent in his heart), dysthymic disorder[1] and a learning disability. R. 118-30, 175. His claim was administratively denied on August 25, 2011. R. 51, 55, 57. In or around October 2011, plaintiff requested a hearing before an administrative law judge ("ALJ"). R. 67. That hearing was held on September 13, 2012, before ALJ Gitel Reich. R. 30. Plaintiff appeared with counsel and testified at the hearing. R. 32-44. On October 12, 2012, the ALJ issued a written decision in which she concluded that plaintiff was not disabled within the meaning of the SSA. R. 17-26. The ALJ's decision became the final order of the Commissioner on January 27, 2014, when the Appeals Council denied plaintiff's request for review. R. 1, 27-29. Plaintiff timely filed this action on March 21, 2014.

B. Treating Sources

The administrative record contains treatment notes, ultrasound reports and lab results from Saint Vincent's Catholic Medical Center of New York ("St. Vincent's"), Back Kim, M.D., Rebecca Jones, M.D., Arbor WeCare and The Puerto Rican Family Institute, Inc.'s Queens

---

[1] "Dysthymic disorder is characterized by chronic low-level depression." The National Institute of Mental Health (NIMH), part of the National Institutes of Health (NIH), a component of the U.S. Department of Health and Human Services, available at http://www.nimh.nih.gov/health/statistics/prevalence/dysthymic-disorder-among-adults.shtml.

Mental Health Clinic ("QMHC"), for treatment provided to plaintiff from September 28, 2007 to May 22, 2012.[2]  The following is a distillation of their relevant points.

*1. St. Vincent's*

On September 28, 2007, plaintiff was hospitalized at St. Vincent's for coronary artery intervention (the placement of a stent and a balloon).  R. 206-21.  He tolerated the procedure well and was discharged the following day.  R. 204.  Upon discharge, plaintiff was stable and ambulatory and was diagnosed with obstructive coronary artery disease, obesity, high cholesterol and a history of depression.  R. 204-05.  Plaintiff was prescribed aspirin, Plavix[3] and Lipitor,[4] and instructed to follow a cardiac prudent diet and refrain from lifting, pulling and pushing ten pounds or more for one week.  R. 205.  He was also instructed to follow up with Dr. Damian Kurian at his Queens office in one week.  Id.[5]

*2. Dr. Back Kim*

On February 12, 2010, plaintiff was examined by cardiologist Dr. Back Kim.  R. 373-75.

---

[2]  I have disregarded the treatment records from Elmhurst Hospital Center's Emergency Department (R. 254-55) because they are irrelevant to plaintiff's claimed disabilities (and neither party suggests otherwise).

[3]  Plavix® is the brand name of the blood-thinning drug Clopidogrel.  See MedlinePlus, a service of the U.S. National Library of Medicine and the National Institutes of Health, available at https://www.nlm.nih.gov/medlineplus/druginfo/meds/a601040.html.

[4]  Lipitor® (the brand name of Atorvastatin) "is in a class of medications called HMG-CoA reductase inhibitors (statins).  It works by slowing the production of cholesterol in the body to decrease the amount of cholesterol that may build up on the walls of the arteries and block blood flow to the heart, brain, and other parts of the body."  MedlinePlus, at https://www.nlm.nih.gov/medlineplus/druginfo/meds/a600045.html.

[5]  The record contains no additional treatment notes from Dr. Kurian.

Plaintiff's complaints included:  dyspnea[6] upon physical exertion; sudden chest pain and tightness lasting three to five minutes; occasional dizziness, fatigue and numbness in his left hand; and palpitations when sleeping on his left side.  R. 373.  Dr. Kim physically examined plaintiff and noted no abnormal findings.  R. 373-74.  An echocardiogram revealed normal left ventricle chamber size and function, a thickened mitral valve associated with mitral regurgitation, mitral valve prolapse, mild concentric left ventricle hypertrophy[7] and mild tricuspid regurgitation without stenosis.[8]  R. 374-76.  Plaintiff also underwent a carotid duplex scan and diagram, which indicated 40% non-calcified plaque in the right proximal internal carotid artery and 20% thickening of the left proximal common carotid artery.  R. 374-75, 377. Dr. Kim scheduled a nuclear stress test for plaintiff, and set him up with a holter monitor to rule out significant arrhythmia.  R. 375.

Plaintiff underwent nuclear stress testing on February 16, 2010.  R. 378-79.  During the stress test, plaintiff did not experience chest pain or arrhythmia and his EKG response was normal.  R. 378.  Stress imagining revealed no evidence of ischemic.[9]  R. 378-79.

---

[6]  Dyspnea is defined as "[d]ifficulty in breathing, often associated with lung or heart disease and resulting in shortness of breath."  *The American Heritage® Stedman's Medical Dictionary*, Houghton Mifflin Company, accessed at Dictionary.com, http://dictionary.reference.com/browse/dyspnea?s=t.

[7]  Hypertrophy is defined as "[a] nontumorous enlargement of an organ or a tissue as a result of an increase in the size rather than the number of constituent cells."  *The American Heritage® Stedman's Medical Dictionary*, at http://dictionary.reference.com/browse/hypertrophy?s=ts.

[8]  Stenosis is defined as "a constriction or narrowing of a duct or passage; a stricture." *The American Heritage® Stedman's Medical Dictionary*, at http://dictionary.reference.com/browse/stenosis.

[9]  Ischemic is defined as "[a] decrease in the blood supply to a bodily organ, tissue, or part caused by constriction or obstruction of the blood vessels."  *The American Heritage®*

Plaintiff returned to Dr. Kim on September 18, 2010.  R. 380-81.  Plaintiff complained of mild dyspnea upon physical exertion, relieved by a few minutes of rest.  R. 380.  His physical examination results were normal and unchanged from Dr. Kim's prior examination.  Id.  Dr. Kim noted four "active" problems with which plaintiff suffered: other and unspecified mitral valve diseases; palpitations; unspecified late effects of cerebrovascular disease; and occlusion and stenosis of carotid artery without cerebral infarction.  R. 381.  Dr. Kim assigned "medium" priority to these problems and described them as "transient."  Id.  He prescribed metoprolol[10] and noted that plaintiff was stable and should return for a regular follow-up visit in six months.  Id.

Plaintiff returned to Dr. Kim on February 19, 2011, complaining of occasional mild shortness of breath on physical exertion (relieved by rest) and "left sided pinching chest pain lasting a few seconds without radiation on physical exertion for the past 4 weeks."  R. 382.  Dr. Kim reported normal and unchanged physical examination results.  R. 373-74, 382-83.  An EKG indicated normal sinus rhythm and no ischemic changes.  R. 383.  Plaintiff also underwent a repeat echocardiogram, which revealed normal left ventricle chamber size and function, and mitral valve thickening associated with mild mitral regurgitation.  R. 383, 385.  Dr. Kim diagnosed benign hypertensive heart disease without heart failure, other and unspecified

---

*Stedman's Medical Dictionary*, at http://dictionary.reference.com/browse/ischemia?s=t.

[10]  "Metoprolol is used alone or in combination with other medications to treat high blood pressure. It also is used to prevent angina (chest pain) and to improve survival after a heart attack. Metoprolol also is used in combination with other medications to treat heart failure. Metoprolol is in a class of medications called beta blockers. It works by relaxing blood vessels and slowing heart rate to improve blood flow and decrease blood pressure."  MedlinePlus, at https://www.nlm.nih.gov/medlineplus/druginfo/meds/a682864.html.

hyperlipidemia,[11] other and unspecified mitral valve diseases, palpitations and unspecified late effects of cerebrovascular disease. R. 383. He advised plaintiff to lose weight and scheduled him for another stress test in one month. Id.

Plaintiff underwent the stress test on March 24, 2011. R. 386-87. Although plaintiff did not experience chest pain during the stress test, occasional premature ventricular contractions were noted and the stress conclusion was "mildly positive ischemic ST changes." R. 386. Stress imaging did not reveal a perfusion defect; Dr. Kim found "[n]o evidence of ischemic on perfusion scan." R. 386-87.

Plaintiff returned to Dr. Kim on August 11, 2011 for pre-operative cardiac clearance for dental treatment (implants, bone grafts and tooth extractions) under general anesthesia. R. 388. He was seen by Nurse Practitioner Nguyet Duong; Dr. Kim reviewed and signed plaintiff's chart. Plaintiff complained of mild shortness of breath upon exertion (relieved after a few minutes of rest) and mild dizziness upon overexertion. Id. His physical examination was unremarkable and consistent with previous examinations. R. 373-74, 382-83, 388. Plaintiff was cleared for surgery. R. 389.

He returned to Dr. Kim on November 10, 2011 with multiple complaints: mild dyspnea when climbing more than four flights of stairs and upon physical exertion (relieved by a few minutes of rest); mild dizziness lasting a few seconds upon physical exertion and repositioning; mild palpitations associated with shortness of breath lasting a few seconds with no known triggering factors; and, over the past few weeks, mild mid-abdominal pain and mild leg pain and

---

[11] Hyperlipidemia (or lipemia) is defined as "[a]n excess of fat or lipids in the blood." *The American Heritage® Stedman's Medical Dictionary*, at http://dictionary.reference.com/browse/lipemia.

cramping (especially in the right leg) when walking several blocks (all relieved by rest). R. 390. Plaintiff reported "feeling better overall." Id. He was seen by Nurse Practitioner Nguyet Duong; Dr. Kim reviewed and signed plaintiff's chart. R. 391. Physical examination results were generally normal and consistent with previous examinations, except for the "presence of 2/6 systolic murmur along left sternal border." R. 391. See R. 373-74, 382-83, 388. A carotid ultrasound revealed minimal intimal thickening in the right carotid, 30% thickening in the right external carotid artery; minimal intimal thickening in the left carotid, and 10% thickening in the left common carotid artery. R. 391, 398-99. Plaintiff was advised to lose weight and to return to Dr. Kim as needed. R. 391.

Plaintiff returned to Dr. Kim on February 28, 2012, with complaints similar to those noted at his prior visit: mild dyspnea after climbing a few flights of stairs, lasting a few minutes and relieved by rest; mild mid-chest pain with associated sensation of pressure upon physical exertion, lasting a few seconds and relieved by rest; mild dizziness after climbing two to three flights of stairs; occasional palpitations lasting five to ten seconds;  right leg pain when walking or standing for long periods; headaches; and abdominal pain. R. 393-94. Physical examination results were unchanged from the previous visit. R. 391, 393-94. An EKG indicated normal sinus rhythm and heart rate, and no acute ischemic changes. R. 395. An echocardiogram showed (1) normal left ventricle size, (2) septal wall thickness of 1.9 cm and posterior wall thickness of 2.0 cm, (3) a calculated left ventricle ejection fraction of 73%,[12] and (4) the presence

---

[12] "Ejection fraction is a measurement of the percentage of blood leaving your heart each time it contracts. . . . The left ventricle is the heart's main pumping chamber, so ejection fraction is usually measured only in the left ventricle (LV). An LV ejection fraction of 55 percent or higher is considered normal." Mayo Foundation for Medical Education and Research website, available at http://www.mayoclinic.org/ejection-fraction/expert-answers/faq-20058286.

of mild mitral valve regurgitation and prolapse.  R. 395-97.  Dr. Kim scheduled plaintiff for a

stress test in two weeks, and noted he would "consider discontinuing Plavix if stress test

outcome is normal."  R. 395.

Plaintiff underwent the stress test on March 15, 2012.  R. 400-01.  Although plaintiff did

not experience chest pain during the stress test, occasional premature ventricular contractions

were noted; the stress conclusion was "normal EKG response to exercise awaiting nuclear

imaging."  R. 400.  Stress imaging did not reveal a perfusion defect.  Id.  Dr. Kim found "[g]ood

exercise tolerance without chest pain – no evidence of ischemic on myocardial perfusion

imaging at maximal heart rate."  R. 401.  He assessed a "[l[ow likelihood" that plaintiff had

coronary artery disease.  Id.

### 3.  Dr. Rebecca Jones

On September 9, 2010, pursuant to a referral by the homeless shelter for housing

evaluation, plaintiff was examined by psychiatrist Dr. Rebecca Jones.  R. 231-34 (repeated at R.

256-59).  Plaintiff reported the following:

He had been homeless and in the shelter for about a month and a half.  R. 231.  Prior to

that, he was living with his mother and sister in a small apartment, but he got into an argument

with his sister and she threw him out.  Id.  Plaintiff denied a history of substance or alcohol

abuse.  R. 232.  He did not like the shelter because "there's too much drug abuse and I know I'm

going to pick up nasty habits here."  R. 231.  He was not eating or sleeping well; he often cried at

night and felt "lost."  Id.  Plaintiff had intermittent thoughts of suicide but did not want to act on

them because he wanted "to turn things around."  Id.  He denied any homicidal ideation or

psychotic symptoms.  He stated that he had been "in therapy before and it helped" and he was in

the process of trying to find a new therapist.  Id.  Plaintiff stated that he had two cardiac stents

-8-

placed on September 31, 2007, and that he regularly sees his cardiologist, Dr. Kim.  R. 232.  He

claimed he was hospitalized since then with increased blood pressure and "thick blood."  Id.

Upon examination, Dr. Jones noted that plaintiff was adequately nourished, casually

dressed and cooperative.  Id.  His hygiene and grooming were adequate.  Id.  There were no

obvious abnormalities in his motor activity; his speech was normal in rate and volume; his

thought content was organized.  R. 232-33.  Plaintiff's affect was constricted and his mood was

depressed.  Id.  Dr. Jones noted plaintiff's intermittent thoughts of suicide, with "no active plan

or intent currently."  R. 233.  On cognitive testing, plaintiff was alert and oriented but he could

not read or write.  Id.  Plaintiff's insight was difficult to assess, but he was aware that he needed

psychiatric treatment and seemed willing to work with staff to set up services.  Id.  His impulse

control during the interview was "intact."  Id.

Dr. Jones rated plaintiff's global assessment of function ("GAF") at 40.  R. 234.[13]  She

diagnosed depressive disorder NOS,[14] learning disorder NOS, borderline intellectual functioning

and the need to rule out mental retardation.  R. 233.  Dr. Jones recommended that plaintiff

receive out-patient psychiatric treatment as soon as possible, and referred him to Arbor WeCare.

---

[13]  "GAF is a scale that indicates the clinician's overall opinion of an individual's
psychological, social, and occupational functioning."  Petrie v. Astrue, 412 F. App'x 401, 406
n.2 (2d Cir. 2011) (citing American Psychiatric Association, Diagnostic and Statistical Manual
of Mental Disorders 376-77 (4th ed. rev. 2000)) ("DSM-IV").  "A GAF between 31 and 40
indicates '[s]ome impairment in reality testing or communication (e.g., speech is at times
illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school,
family relations, judgment, thinking or mood.'"  Gonzalez v. Colvin, No. 14 Civ. 6206, 2015
WL 1514972, at *5 n.6 (S.D.N.Y. Apr. 1, 2015) (quoting DSM-IV, at 30-32).  "The Fifth Edition
of the DSM has discarded the use of GAF Scores."  Id. (citing American Psychiatric Association,
Diagnostic and Statistical Manual of Mental Disorders (5th ed. 2013).  At the time of plaintiff's
treatment, however, the DSM-IV was still in effect.

[14]  NOS is an abbreviation for "not otherwise specified."  See Mitchell v. Colvin, No.
09–CV–5429, 2013 WL 5676289, at *2 n.4 (E.D.N.Y. Oct. 17, 2013).

R. 234.[15]

### 4. *Arbor WeCare*

Plaintiff reported to Arbor WeCare on October 8, 2010 and underwent an intake interview and a physical examination. R. 264-79. Plaintiff reported that he had been living at a men's shelter for the past two or three months, and that he had stopped working about eight months earlier due to a medical condition. R. 268-69. He denied any history of alcohol or substance abuse. R. 270, 276-77. Plaintiff's physical examination was normal, with the exception of the following finding noted by Dr. Thomas: occasional night sweats; occasional tinnitus (left ear); chest pain and history of cardiac catheterization; obesity; gum disease; depression and anxiety. R. 277-78. Dr. Thomas referred plaintiff for a psychiatric examination. R. 279.

On October 12, 2010, plaintiff was examined by Arbor We Care psychiatrist Dr. Margaret Chu. R. 283-89. Plaintiff complained of depressed mood, anxiety and/or fearfulness, crying, insomnia and that he is easily startled. R. 283-84. He also reported that he feels rejected and lonely and has passive suicidal thoughts, that he is sick and cannot work "in heavy type of work," that he cannot read or write and that he worries about his future. R. 284. Dr. Chu noted plaintiff's reported history of psychotic symptoms: "voices that are mainly unspecific, name calling and derogatory but never command type; has been experiencing this for a long time;

---

[15] "WeCARE, the New York City Human Resources Administration's Wellness, Comprehensive Assessment, Rehabilitation and Employment program, addresses the needs of cash assistance clients with medical and/or mental health barriers to employment by providing customized assistance and services to help them achieve their highest levels of self-sufficiency. The WeCARE program is available by referral only. Based on the outcome of a comprehensive assessment, a case manager works with an individual client to develop a customized plan that connects them to a range of appropriate services." See Fedcap Rehabilitation Services, Inc. website, available at http://www.fedcap.org/content/wecare.

occasionally [sic] is accompanied by paranoid ideation and fearful behavior." R. 285. Dr. Chu also noted plaintiff's reported history of a learning disability (reading and writing) and special education, and that he denied a history of alcohol or drug abuse. Id. Dr. Chu reported the results of plaintiff's psychiatric examination as follows:

Plaintiff was calm and cooperative; his appearance was neat; he demonstrated normal speech cadence, normal affect range and thought content; his thought form was logical and his mood was depressed. R. 285. He had no suicidal or homicidal ideation and stated he was not presently hallucinating. Id. Plaintiff was unable to spell and performed a calculation of series of 7's with some mistakes. Id. He was oriented to place and time. R. 286. His ability to follow work rules, accept supervision and relate to co-workers was normal; his ability to deal with the public, maintain attention and adapt to change was mildly impaired; his ability to adapt to stressful situations was moderately impaired. Id. Dr. Chu concluded that plaintiff was temporarily disabled from work but, with treatment, he could likely return to full time work in six months. R. 288. Dr. Chu noted that plaintiff "has never been in psychiatric treatment" and referred him to a mental health clinic. Id. She recommended an IQ evaluation, psychological testing, supportive therapy and a trial of antidepressant and/or neuroleptic medication. Id.

On October 14, 2010, Dr. Thomas reviewed Dr. Chu's findings and incorporated them into a final diagnosis and wellness plan. R. 280-82. Plaintiff was diagnosed with dysthymic disorder, coronary artery disease and a learning disability. R. 280. Dr. Thomas noted that plaintiff required a low stress work environment due to his cardiac problems, and that his dysthymia and learning disability required the following additional accommodations for employment: limited noise; limited numbers of people; limited climbing; limited walking. R. 280-81. Dr. Thomas also noted that plaintiff was "temporarily unemployable" and stated that

plaintiff should be referred to his primary care physician who, in turn, should refer plaintiff for psychiatric treatment.  Id.  Dr. Thomas recommended that Arbor WeCare reevaluate plaintiff after ninety days (the "wellness period").  R. 281, 303.

On January 11, 2011, plaintiff underwent a wellness re-examination.  R. 303-04.  The sparse notes indicate that plaintiff was to continue psychiatric follow up, and his wellness period was continued for sixty days.  R. 303.  Plaintiff was re-evaluated on March 14, 2011; he was diagnosed with mood disorder and borderline intellectual functioning and his wellness period was extended for thirty days.  R. 308.  The last treatment note from Arbor WeCare, on April 14, 2011, indicated an extension of plaintiff's wellness period for thirty days, with a comment that his "psychiatrist needs to provide a list of symptoms which substantiates the need for [plaintiff] not to be unable [sic] to work for 12 months and these symptoms need to meet the SSI criteria for [plaintiff] to be totally disabled."  R. 313.

### 5.  QMHC

Plaintiff first sought treatment at QMHC on November 30, 2009.  R. 370.[16]  In or around November 2010, presumably in accordance with Arbor WeCare's wellness plan, plaintiff resumed treatment at QMHC.  R. 239-40.

On November 19, 2010, QMHC psychiatrist Dr. Yvanka Pachas signed a Treating Physician's Wellness Plan Report ("Wellness Report").  R. 235-36 (repeated at R. 262-63).[17]

_____

[16]  The start date of plaintiff's treatment at QMHC was mentioned in an opinion letter from LMSW Christine Salazar (discussed below).  There are no 2009 treatment notes from QMHC in the record.  Plaintiff's treatment at QMHC in 2009 appears to be the prior "therapy" he reported to Dr. Jones during his housing evaluation interview.

[17]  The form's header states: "Participants in HRA's public assistance program, who have been assessed to have unstable or untreated medical and/or mental health conditions affecting functional capacity and requiring treatment, are placed in a wellness plan (WP).  To assist HRA

The report identified plaintiff's diagnoses (as of January 21, 2010) as mood disorder NOS and borderline intellectual functioning, and noted the need (as of the date of the report) to rule out schizoaffective disorder.  R. 235.  Dr. Pachas reported the following "relevant clinical findings":

> Patient is a 41 year-old man, appears stated age, tall, overweight, fairly groomed; cooperative; good eye contact.  Motor activity: normal; [a]ffect: full range; thought process: concrete & goal directed; mood "ok"; thought content: denies [audio visual hallucinations/paranoid ideation]; denies obsessions or compulsions; orientation x3; intellectual functioning: below average; impulse contro[l]: fair; insight: limited; judgment: fair.

Id.  Dr. Pachas noted that plaintiff attended weekly psychotherapy sessions and monthly medication management appointments.  Id.  She also reported that plaintiff's housing situation had exacerbated his depressive symptoms.  R. 236.  In the box marked "functional capacity," Dr. Pachas indicated that plaintiff was "[u]nable to work for at least 12 months."  Id.

Dr. Pachas signed a second Wellness Report on January 25, 2011.  R. 239-40 (repeated at R. 260-61).  The second report identified plaintiff's diagnoses as mood disorder NOS and borderline intellectual functioning.  R. 239.  The reported relevant clinical findings were identical to those noted in the previous report.  Id.  Dr. Pachas reported that plaintiff's condition had not resolved or stabilized, and noted: "Patient has severe cognitive limitations, poor impulse control, depressive symptoms remain (patients [sic] living condition are [sic] extremely stressful)."  R. 240.[18]  In the box marked "functional capacity," Dr. Pachas indicated that plaintiff

---

to determine your patient's functional capacity and ability to participate in work-related activities at the completion of the WP, please complete and sign this report and/or provide copies of any medical reports and/or progress notes that would be relevant to making this determination."  R. 235, 237, 239, 262.

[18]  Dr. Pachas' statement that plaintiff had "poor impulse control" (R. 240) is inconsistent with her statement under "Relevant Clinical Findings" (R. 239) that plaintiff's impulse control was "fair."

was "[u]nable to work for at least 12 months."  Id.

On March 15, 2011, Dr. Pachas signed a third Wellness Report.  R. 237-38.  The third report reiterated the diagnoses from the two previous reports (mood disorder NOS and borderline intellectual functioning).  R. 237.  The reported relevant clinical findings were identical to those noted in both previous reports, with the exception of plaintiff's mood (described as "sad").  Id. Dr. Pachas reported that plaintiff's condition had not resolved or stabilized, and noted: "Patient's depressive symptoms have exacerbated [sic] since patient became homeless and continues to live in a NYC shelter."  R. 238.  In the box marked "functional capacity," Dr. Pachas indicated that plaintiff was "[u]nable to work for at least 12 months."  Id.

The record also contains a report (in letter form), dated May 22, 2012, from Christine Salazar LMSW, a clinical therapist at QMHC.  R. 370-71.[19]  Ms. Salazar noted that plaintiff began treatment at QMHC on November 30, 2009 and was initially diagnosed with mood disorder NOS and borderline intellectual functioning; she indicated that plaintiff was currently diagnosed with those two conditions as well as personality disorder NOS.  R. 370-71.  Ms. Salazar noted that plaintiff has complied with all medical requests and scheduled appointments, and takes medication as directed.  R. 370.  She reported that plaintiff "has shown some improvement" with medication and therapy, and he "continues to work on decreasing depressive symptoms, anger, elevating self-esteem, increasing supportive networks, and developing insight on [diagnosis] and coping skills."  Id.  According to Ms. Salazar, plaintiff was also receiving substance abuse treatment at The Recovery Center "and has been doing fairly well."  Id.  Ms.

_____

[19]  Ms. Salazar's report may have been prompted by Arbor WeCare's notation on April 14, 2011, expressing the need for plaintiff's psychiatrist to provide a list of symptoms which substantiates plaintiff's alleged inability to work for twelve months.  R. 313.

Salazar expressed concern "about Mr. Alicea's ability to seek employment due to educational issues" and noted plaintiff's "long standing [history] of academic deficits that hinder his ability to obtain steady employment." R. 370-71. She assessed plaintiff's GAF at 50[20] and stated his prognosis was "fair." R. 371. Ms. Salazar opined "that Mr. Alicea's mental health issues, coupled with his unstable housing conditions, financial problems [and] learning disability create an obstacle for the patient to seek steady employment."

Id.

C.  Consultative Examinations

    1.  *Michael Alexander, Ph.D.*

On July 25, 2011, psychologist Michael Alexander conducted a consultative examination of plaintiff. R. 314-17. Plaintiff stated that he completed elementary school, that he was in special education for learning problems and is unable to read or write. R. 314. He reported that he had been residing in the shelter system for a year and a half, he last worked as a handyman for six years until he was laid off in 2004, and he was currently unemployed because "I can't fill out applications." Id. Plaintiff complained of difficulty falling asleep, increased appetite and a ten-year history of dysphoric mood, but denied suicidal and homicidal ideation and further symptoms of depression. Id. He reported "a lifelong history of cognitive deficit, manifest in general learning limitations." Id. Dr. Alexander observed no evidence of a thought disorder or panic- or manic-related symptoms. Id. He noted plaintiff's history of occasional use of alcohol and cannabis. R. 315.

_____

[20] "A GAF range of 41-50 indicates that the individual has a serious impairment in one of the following: social, occupational, or school functioning." Pollard v. Halter, 377 F.3d 183, 186 n.1 (2d Cir. 2004) (quoting DSM-IV, at 32).

Plaintiff was cooperative, friendly and alert during the mental status exam.  Id.  Dr. Alexander noted that plaintiff was well-groomed and appropriately dressed, his manner of relating, social skills and expressive and receptive language were adequate and his eye contact was appropriate.  Id.  According to Dr. Alexander, plaintiff's thought processes were "[c]oherent and goal directed with no evidence of hallucinations, delusions, or paranoia in the examination," his mood was neutral and he demonstrated a full range of affect appropriate to speech and thought content.  Id.  Dr. Alexander noted that plaintiff's attention and concentration were intact, and he was able to count and perform simple calculations and serial 3's.  Id.  The doctor also noted that plaintiff's recent and remote memory skills were intact, and that he identified 3/3 objects immediately, 3/3 after five minutes and performed five digits forward and two digits back.  R. 316.  Dr. Alexander estimated that plaintiff's cognitive functioning was below average, and noted that his insight and judgment were adequate but his general fund of information was somewhat limited.  Id.  The doctor also noted that plaintiff is able to dress, bathe and groom himself and takes public transportation independently.  Id.  Plaintiff reported that he "would be able to cook, clean, shop, and manage his own money if circumstances permitted."  Id.  He stated that he does not have any friends, he is not close to any family members, and he spends his time at the shelter but does little else.  Id.

Dr. Alexander evaluated plaintiff's functional abilities as follows:  plaintiff can follow and understand simple directions, perform simple tasks independently, maintain attention and concentration, maintain a regular schedule and learn new tasks; he is able to "perform more complex tasks independently within the scope of his intellectual ability, which is somewhat limited"; he "can make appropriate decisions, relate adequately with others, and can appropriately deal with stress."  R.316.  The doctor also noted: "The results of the examination

appear to be consistent with psychiatric problems, which in itself, is [sic] not significant enough to interfere with the claimant's ability to function on a daily basis." Id.  Dr. Alexander diagnosed dysthymic disorder with the need to rule out learning disability NOS, and assessed plaintiff's prognosis as "good."  R. 316-17.

   2.  *Dr. Jerome Caiati*

   On July 25, 2011, Dr. Jerome Caiati conducted a consultative internal medicine examination of plaintiff.  R. 332-35.  He noted plaintiff's history of hypertension, coronary artery disease and "depression with continued substance abuse."  R. 332.  Plaintiff reported intermittent chest pain and that his last stress test, four months earlier, was negative.  Id.  Dr. Caiati noted plaintiff's current medications:  Plavix; Sertraline;[21] Metoprolol; Divalproex;[22] Simvastatin;[23] and aspirin.  Id.  Plaintiff stated that he smokes a half-pack of cigarettes daily (since he was twenty-one) and uses marijuana (which he started at age twenty-five), but denied alcohol use.  Id.  Plaintiff stated he can shower and dress himself; he did not indicate whether or not he is able to cook, clean, do laundry or go shopping because, according to plaintiff, the shelter provided these services.  R. 333.

---

   [21]  "Sertraline is in a class of antidepressants called selective serotonin reuptake inhibitors (SSRIs).  It works by increasing the amounts of serotonin, a natural substance in the brain that helps maintain mental balance."  MedlinePlus, at https://www.nlm.nih.gov/medlineplus/druginfo/meds/a697048.html.

   [22]  Divalproex sodium is "used to treat mania (episodes of frenzied, abnormally excited mood) in people with bipolar disorder (manic-depressive disorder; a disease that causes episodes of depression, episodes of mania, and other abnormal moods)."  MedlinePlus, at https://www.nlm.nih.gov/medlineplus/druginfo/meds/a682412.html.

   [23]  Simvastatin [like Lipitor®] is in the class of medications called HMG-CoA reductase inhibitors (statins), which slow the production of cholesterol in the body.  See MedlinePlus, at https://www.nlm.nih.gov/medlineplus/druginfo/meds/a692030.html.

Dr. Caiati observed that plaintiff was obese, he appeared to be in no acute distress and he used a cane (which, he stated, was prescribed by a doctor for balance).  Id.  His gait (with or without the cane) was normal, his stance was normal, his squat was full (although he held the table) and he could walk on heels and toes without difficulty.  Id.  Plaintiff needed no help changing for the exam or getting on and off the exam table, and was able to rise from a chair without difficulty.  Id.

Plaintiff's skin, lymph nodes, head, face, eyes, ears, nose, throat and neck were normal.  Id.  His lungs were clear to auscultation and percussion was normal.  Id.  There was no significant chest wall abnormality and diaphragmatic motion was normal.  Id.  Plaintiff's heart rhythm was regular with no audible murmur, gallop or rub.  R. 334.  Dr. Caiati's examination of plaintiff's abdomen was limited by his obesity, but the doctor noted no abnormalities.  Id.  Plaintiff's extremities were normal.  Id.  Neurologic examination revealed no motor or sensory deficit.  Id.  Plaintiff's hand and finger dexterity were intact, his grip strength was 5/5 bilaterally and his pinch was 5/5 all fingers to thumbs bilaterally.  Id.

Plaintiff's cervical spine showed full flexion, extension, bilateral flexion and bilateral rotation.  Id.  There was no scoliosis, kyphosis or abnormality in plaintiff's thoracic spine.  Id.  Plaintiff's lumbar spine flexed 90 degrees, extended 30 degrees, laterally flexed 30 degrees and rotated 80 degrees.  Id.  He had full range of motion, bilaterally, of his shoulders, elbows, forearms and wrists.  Id.  Plaintiff demonstrated bilateral hip flexion of 120 degrees, bilateral internal hip rotation of 45 degrees, bilateral external hip rotation of 90 degrees, bilateral knee flexion of 140 degrees and extension of 180 degrees, bilateral ankle dorsiflex of twenty degrees and plantar flexion of forty degrees.  Id.  There were no evident subluxations, contractures, ankylosis or thickening.  Id.  Plaintiff's joints were stable and nontender, with no redness, heat,

swelling or effusion.  Id.

   According to Dr. Caiati's diagnosis:  (1) plaintiff was obese (and his prognosis was "fair" with diet and weight loss); (2) he had a history of hypertension but was asymptomatic (and his prognosis was "fair" with diet, weight loss and medication adjustment); (3) he had a history of coronary artery disease (which was "stable"); (4) plaintiff had a history of depression and substance abuse (and would benefit from psychiatric or psychological evaluation for prognosis); and (5) plaintiff had a history of balance deficit which was not evidenced upon physical examination.  R. 334-35.  Dr. Caiati opined that plaintiff was unrestricted in sitting, standing, walking, reaching, pushing, pulling, lifting, climbing and bending.  R. 335.

D. Plaintiff's Hearing Testimony

   At the time of the hearing, plaintiff lived in a studio apartment at 67 McCombs Place, apartment 101A.  R. 34, 43.  He admitted a history of marijuana use, and that he still used it "once in a while . . . like, once every other week, for entertainment."  R. 39-40.  He denied any history of alcohol abuse.  R. 40.  He spends his days going to "drug meetings" at a drug treatment center.  R. 43.  He tries "to socialize a little bit" but "can't get people to talk" to him. R. 44.  Plaintiff thinks this is because he "come[s] at them weird and stuff."  Id.

   Plaintiff had been employed as a handyman from 1999 through 2006, and again from 2008 through 2009 (for a real estate management company).  R. 34, 36.  Plaintiff did "heavy work" as a handyman, such as laying floors and installing air conditioning ducts; he also did maintenance work such as replacing light fixtures and bulbs.  R. 34-35.  He learned all of his handyman skills through on the job training.  R. 36.  Plaintiff was laid off from his last position in December 2009 because his "performance wasn't the same"; specifically, he was not "as fast" and "wasn't doing the jobs like [he] was doing them before."  R. 36-37.  After he was laid off, he

-19-

filled out an application at Home Depot (for openings in the wood and tools departments) and looked for work "anywhere" he saw a help wanted sign. R. 38-39. He went on interviews but nothing panned out: "I'd give them my resume; everybody says the same thing: you're over qualified, you're under qualified." R. 38. Plaintiff "gave up" looking for work in 2010, when he entered the shelter system, because he "didn't find no hope" and was getting angry and depressed. R. 38-39.

In response to questioning by his counsel, plaintiff explained why he could no longer work: "Because I can't perform like I used to. I'm not as fast, I'm a little slower. I get tired faster, . . . I can't stay focused on something, on a job . . . my mind is just not there no more." R. 40. Plaintiff also testified that he sees a therapist once a week and a psychiatrist every other month, at the Puerto Rican Family Institute, and that the "talk therapy" helps. R. 40-41. He has panic attacks for which he takes medication and, as a result, he had not had one in a while. R. 41. Plaintiff experiences no side effects from the medication. Id. The medication also helps his depression and anger. R. 42. Plaintiff testified, however, that–even with medication– he cannot work: "Because I'm afraid that, you know, I might go back into the field and I might not be the same, I'm not going to be the same because with things like this, the kind of tools I used and stuff like that, it's not going to let me do it right. I might end up cutting one of my fingers off." R. 42-43.

### III. LEGAL STANDARDS

A. Standard of Review

In reviewing a decision of the Commissioner, a district court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a

rehearing."  42 U.S.C. § 405(g).  "It is not the function of a reviewing court to decide *de novo* whether a claimant was disabled."  Melville v. Apfel, 198 F.3d 45, 52 (2d Cir. 1999).  Rather, the court's review is limited to "'determin[ing] whether there is substantial evidence supporting the Commissioner's decision and whether the Commissioner applied the correct legal standard.'"  Poupore v. Astrue, 566 F.3d 303, 305 (2d Cir. 2009) (quoting Machadio v. Apfel, 276 F.3d 103, 108 (2d Cir. 2002)).

The substantial evidence standard is "even more" deferential than the "'clearly erroneous' standard."  Brault v. Soc. Sec. Admin, 683 F.3d 443, 448 (2d Cir. 2012).  The reviewing court must defer to the Commissioner's factual findings and the inferences drawn from those facts, and the Commissioner's findings of fact are considered conclusive if they are supported by substantial evidence.  See 42 U.S.C. § 405(g); Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000).  Substantial evidence is "'more than a mere scintilla'" and "'means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  Lamay v. Comm'r of Soc. Sec., 562 F.3d 503, 507 (2d Cir. 2009) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)).  "In determining whether the agency's findings are supported by substantial evidence, the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn."  Talavera v. Astrue, 697 F.3d 145, 151 (2d Cir. 2012) (internal quotation marks and citation omitted).  "When there are gaps in the administrative record or the ALJ has applied an improper legal standard," remand to the Commissioner "for further development of the evidence" or for an explanation of the ALJ's reasoning is warranted.  Pratts v. Chater, 94 F.3d 34, 39 (2d Cir. 1996).

B.  Statutory Disability

A claimant is disabled under the SSA when he or she lacks the ability "to engage in any

substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be expected to

last for a continuous period of not less than 12 months . . . ."  42 U.S.C. § 423(d)(1)(A).  In

addition, a person is eligible for disability benefits under the SSA only if

> his physical or mental impairment or impairments are of such severity that he is
> not only unable to do his previous work but cannot, considering his age,
> education, and work experience, engage in any other kind of substantial gainful
> work which exists in the national economy, regardless of whether such work
> exists in the immediate area in which he lives, or whether a specific job vacancy
> exists for him, or whether he would be hired if he applied for work.

Id. § 423(d)(2)(A).

Social Security Regulations set forth a five-step sequential analysis for evaluating

disability claims under the SSA:

> (1) whether the claimant is currently engaged in substantial gainful activity;
> (2) whether the claimant has a severe impairment or combination of impairments;
> (3) whether the impairment meets or equals the severity of the specified
> impairments in the Listing of Impairments;
> (4) based on a "residual functional capacity" assessment, whether the claimant
> can perform any of his or her past relevant work despite the impairment; and
> (5) whether there are significant numbers of jobs in the national economy that the
> claimant can perform given the claimant's residual functional capacity, age,
> education, and work experience.

McIntyre v. Colvin, 758 F.3d 146, 150 (2d Cir. 2014) (citing 20 C.F.R. §§ 404.1520(a)(4)(I)-(v),

416.920(a)(4)(I)-(v)).  The claimant bears the burden of proof as to the first four steps of the

process.  See Burgess v. Astrue, 537 F.3d 117, 120 (2d Cir. 2008).  If the claimant proves that

his impairment prevents him from performing his past work, the burden shifts to the

Commissioner at the fifth and final step.  See Brault, 683 F.3d at 445.

Additionally, where a claimant suffers from an alleged mental impairment, the ALJ is

required to utilize a "special technique" at the second and third steps.  See Kohler v. Astrue, 546

-22-

F.3d 260, 265 (2d Cir. 2008); see also 20 C.F.R. §§ 404.1520a, 416.920a.  At step two, in

determining whether the claimant has a "severe impairment," the ALJ must rate the claimant's

degree of functional limitation in four areas: (1) activities of daily living; (2) social functioning;

(3) concentration, persistence, or pace; and (4) episodes of decompensation.  See Kohler, 546

F.3d at 266; 20 C.F.R. §§ 404.1520a(b)-(c), 416.920a(b)-(c).  If the claimant's mental

impairment or combination of impairments is severe, then at step three the ALJ must "compare

the relevant medical findings and the functional limitation ratings to the criteria of listed mental

disorders in order to determine whether the impairment meets or is equivalent in severity to any

listed mental disorder."  Kohler, 546 F.3d at 266 (citing 20 C.F.R. § 404.1520a(d)(2)).  If the

claimant suffers from a severe impairment which is not listed (or equivalent in severity to a

listed mental disorder), then the ALJ must assess the claimant's residual functional capacity.

See id. (citing § 404.1520a(d)(3)).

## IV.  THE ALJ'S DECISION

To assess plaintiff's disability claim, the ALJ followed the five-step sequential analysis

and applied the "special technique" at steps two and three.  See 20 C.F.R. §§ 404.1520(a)(4)(i)-

(v), 416.920(a)(4)(i)-(v), 404.1520a, 416.920a and discussion, supra.  At step one, the ALJ

concluded that plaintiff had not engaged in substantial gainful activity since December 2, 2009,

the alleged onset date of his disability.  R. 13.  At step two, the ALJ concluded that plaintiff's

history of coronary artery disease (treated with percutaneous coronary intervention),

hypertension, obesity, dysthymic disorder, learning disorder NOS and borderline intellectual

functioning constituted "severe impairments" within the meaning of the SSA.  Id.

At step three, the ALJ determined that plaintiff's impairments (individually or combined)

did not meet or medically equal the severity of one of the listed impairments in 20 C.F.R. Part

404, Subpart P, Appendix 1.  R. 13-14.  The ALJ concluded that plaintiff has no restrictions in activities of daily living and social functioning, and moderate difficulties with concentration, persistence and pace.  R. 14.  She noted that plaintiff has never been hospitalized for psychiatric treatment or experienced an episode of decompensation of extended duration.  Id.

At step four, the ALJ concluded that plaintiff has the residual functional capacity ("RFC") to perform light work, limited to simple work.  R. 15.  In reaching this conclusion, the ALJ considered "all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence" and "opinion evidence" in accordance with 20 C.F.R. §§ 404.1527, 404.1529, 416.927 and 416.929 and the Social Security Rulings 96-4p, 96-7p, 96-2p, 96-5p, 96-6p and 06-3p.  R. 15-16.  Overall, the ALJ determined that, while plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," his "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment."  R. 16.  The ALJ also noted that plaintiff's inability to read and write "would not impede his ability to sustain employment" based upon his testimony that he worked as a handyman for approximately twenty years, that he learned how to do electrical work, carpet-laying and door installation on the job, and that he sought a job selling tools at Home Depot because he knows how to use tools.  R. 19.  Finally, at step four, the ALJ determined that plaintiff is unable to perform any past relevant work.  Id.

At step five, the ALJ considered plaintiff's RFC, age, education and work experience in conjunction with the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2. R. 20.  The ALJ concluded that jobs exist in significant numbers in the national economy that plaintiff can perform and, thus, found plaintiff "not disabled" as defined in the SSA.  Id.

## V.  ASSESSING THE ALJ'S FINDINGS

Plaintiff challenges the Commissioner's decision on three grounds: (1) the ALJ erroneously accorded "little, if any" weight to clinical therapist Christine Salazar's opinion; (2) the ALJ failed to accord adequate weight to psychiatrist Dr. Yvanka Pachas' opinion; and (3) the ALJ erroneously accorded considerable weight to the opinion of consultative psychological examiner Dr. Michael Alexander.  Plaintiff's Memorandum of Law in Support of Plaintiff's Motion for Judgment on the Pleadings ("Pl. Mem."), at 10-13.  Defendant maintains that the determination that plaintiff is not disabled "is supported by substantial evidence in the record and is based upon the application of the correct legal standards."  Memorandum of Law in Support of Defendant's Motion for Judgment on the Pleadings ("Def. Mem."), at 1.

A.  The Treating Physician Rule

The ALJ must give "controlling weight" to a "medical opinion" from a claimant's "treating source" if the treating source's opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the administrative record.  20 C.F.R. §§ 404.1527(c)(2); 416.927(c)(2).  See Greek v. Colvin, 802 F.3d 370, 375 (2d Cir. 2015).  A "treating source" is a claimant's "own physician, psychologist, or other acceptable medical source who provides [the claimant], or has provided [the claimant] with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant]."[24]  20 C.F.R. §§ 404.1502, 416.902.  "Medical

---

[24]  An "ongoing treatment relationship" exists where the claimant "see[s], or ha[s] seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [the claimant's] medical condition(s)."  20 C.F.R. § 404.1502.  The SSA "may consider an acceptable medical source who has treated or evaluated [the claimant] only a few times . . . to be [the claimant's] treating source if the nature and frequency of the treatment or evaluation is typical for [the claimant's] condition(s)."  Id.

opinions are statements from physicians and psychologists or other acceptable medical sources

that reflect judgments about the nature and severity of [a claimant's] impairments, including [the

claimant's] symptoms, diagnosis and prognosis, what [the claimant] can still do despite

impairment(s), and [the claimant's] physical or mental restrictions." 20 C.F.R. §§

404.1527(a)(2); 416.927(a)(2). Where an ALJ determines that a treating source's opinion is not

entitled to controlling weight, the ALJ must consider the following factors in deciding what

weight to accord that opinion: (1) the length of the treatment relationship and frequency of

treatment; (2) the nature and extent of the treatment relationship; (3) explanations the source

provides for the opinion; (4) the extent to which the opinion is consistent with the record as a

whole; (5) the treating source's specialization; and (6) any other factors brought to the ALJ's

attention which tend to support or contradict the opinion. 20 C.F.R. §§ 404.1527(c)(2);

416.927(c)(2). The ALJ need not recite each factor explicitly, provided the ALJ's decision

reflects substantive application of the regulation. See Atwater v. Astrue, 512 F. App'x 67, 70 (2d

Cir. 2013) ("We require no such slavish recitation of each and every factor where the ALJ's

reasoning and adherence to the regulation are clear."). However, an ALJ's failure to set forth

"good reasons" for the weight accorded a treating source opinion is a ground for remand. See

Greek, 802 F.3d at 375.

     *1.  LMSW Christine Salazar's opinion*

     At step four, the ALJ discussed LMSW Christine Salazar's report as follows:

> The undersigned has carefully considered the assessment made by
> Christine Salazar, LMSW, on May 22, 2012. In her report, Christine Salazar
> stated that claimant has a history of extreme emotional reactivity when stresses
> occur in his life, and notes that there are concerns about claimant's ability to seek
> employment due to education issues. She states that claimant has a long-standing
> history of academic deficits that hinder his ability to obtain steady employment.
> Christine Salazar opines that claimant's mental health issues, coupled with his

-26-

unstable housing conditions, financial problems, and learning disability create an obstacle for him to seek steady employment. The undersigned is not persuaded by her assessment, as firstly she is a social worker and not a doctor or psychologist. More importantly, even she notes that claimant is improving and is "doing fairly well." Christine Salazar's observations regarding claimant's supposed educational issues are not convincing in light of claimant's past job performance and his attempts to obtain employment.

R. 19 (internal citations to record omitted). Plaintiff contends that "Ms. Salazar's opinion should have been given greater weight as she was most familiar with the claimant's medical history." Pl. Mem., at 12. Defendant asserts that "the ALJ gave the proper weight to Ms. Salazar's opinion." Def. Mem., at 21.

Under the regulations, Ms. Salazar is an "other source" whose opinion "may" be relied upon by the ALJ in determining the severity of plaintiff's impairment and how it affects his ability to work. 20 C.F.R. § 404.1513(d). It was within the ALJ's "discretion to determine the appropriate weight to accord [Ms. Salazar's] opinion based on all the evidence before [her]." Diaz v. Shalala, 59 F.3d 307, 313-14 (2d Cir. 1995). Here, the ALJ "carefully considered" Ms. Salazar's report but was unpersuaded by her assessment. That determination was well within the ALJ's discretion and, accordingly, was not erroneous.

*2. Dr. Yvanka Pachas' opinion*

At step four, the ALJ addressed the three reports submitted by Dr. Pachas (submitted in November 2010, January 2011 and March 2011) as follows:

In the earlier report, Dr. Pachas states that claimant's depressive symptoms have exacerbated since he became homeless, and that claimant continues to live in a New York City shelter. Dr. Pachas opines that claimant is unable to work for at least 12 months, but does not provide support for this assessment outside of claimant's exacerbated depression. In the report from January of 2011, Dr. Pachas states that claimant has severe cognitive limitations, poor impulse control, and that his depressive symptoms remain. She notes that claimant's living conditions are extremely stressful, and again opines that claimant is unable to work for at least 12 months. The report from March of 2011 is similar. The

> undersigned has considered these assessments but accords them limited weight as
> they do not address claimant's functioning once adjusted to living in the shelter.
> In addition, they are not consistent with the credible finding of the consultative
> evaluator.

R. 18 (internal citations to record omitted).

Plaintiff contends that the ALJ erroneously failed to accord greater weight to Dr. Pachas'

opinion (that plaintiff is unable to work for at least twelve months) because (1) Dr. Pachas is a

treating source and (2) her opinion is supported by her evaluations, Dr. Jones' GAF score and

Ms. Salazar's GAF score.  See Pl. Mem., at 10-11.  I note that, although the ALJ did not

explicitly state that Dr. Pachas was a "treating source," the Commissioner tacitly concedes this

point.  See Def. Mem., at 19-20 (arguing that the ALJ properly rejected Dr. Pachas' opinion

within the parameters of the treating physician rule).  However, the "opinion" to which plaintiff

refers–that plaintiff is unable to work for at least twelve months–is an opinion on an issue

"reserved to the Commissioner" because it is dispositive of the case.  See 20 C.F.R. §§

404.1527(d)(1); 416.927(d)(1) ("A statement by a medical source that you are 'disabled' or

'unable to work' does not mean that we will determine that you are disabled.").  Accordingly,

Dr. Pachas' "conclusion of disability was itself not entitled to any weight."  Greek, 802 F.3d at

376.

However, plaintiff also challenges the ALJ's decision to accord greater weight to the

opinion of consultative examiner Dr. Alexander than she accorded to Dr. Pachas' opinion, even

though Dr. Pachas was plaintiff's treating psychiatrist.  See  Pl. Mem., at 13.  At step four, after

summarizing Dr. Alexander's clinical findings, the ALJ stated the following:

> After evaluating claimant, Dr. Alexander opined that he is able to follow
> and understand simple directions, perform simple tasks independently, maintain
> attention and concentration, maintain a regular schedule, learn new tasks, make
> appropriate decisions, relate adequately with other, and appropriately deal with

stress.  Claimant was also found able to perform more complex tasks independently within the scope of his intellectual ability.  The undersigned accords considerable weight to Dr. Alexander's opinions since they are supported by his findings during his evaluation and are consistent with claimant's reported abilities, including his testimony regarding his job search.

R. 18 (internal citations to record omitted).

"It is not per se legal error for an ALJ to give greater weight to a consulting opinion than a treating opinion."  Rivera v. Colvin, No. 13 Civ. 7150, 2015 WL 1027163, at *16 (S.D.N.Y. Mar. 9, 2015).  More specifically, "[a]n ALJ may give greater weight to a consultative examiner's opinion than a treating physician's opinion if the consultative examiner's conclusions are more consistent with the underlying medical evidence."  Mayor v. Colvin, No. 15 Civ. 0344, 2015 WL 9166119, at *18 (S.D.N.Y. Dec. 17, 2015)(citing cases).  Here, the ALJ accorded "considerable weight" to Dr. Alexander's conclusions because (1) they are supported by his clinical findings on examination and (2) they "are consistent with claimant's reported abilities, including his testimony regarding his job search."  R. 18.  The ALJ's latter justification is problematic:  plaintiff testified (at the hearing) that he "gave up" looking for work in 2010, when he entered the shelter system, because he "didn't find no hope" and was getting angry and depressed.  R. 38-39.  Plaintiff also explained why he could no longer work:  "Because I can't perform like I used to.  I'm not as fast, I'm a little slower.  I get tired faster, . . . I can't stay focused on something, on a job . . . my mind is just not there no more."  R. 40.  Thus, contrary to the ALJ's stated justification, Dr. Alexander's assessment of plaintiff's capabilities is at odds with plaintiff's reported capabilities.

Further, addressing plaintiff's corollary argument in this context, although (as discussed above) the ALJ had no duty to credit Dr. Pachas' opinion that plaintiff was unable to work for at least twelve months, the ALJ was required to set forth "good reasons" for assigning only

"limited weight" to the findings upon which Dr. Pachas based her opinion (that plaintiff has severe cognitive limitations, poor impulse control and depressive symptoms exacerbated by extremely stressful living conditions in the homeless shelter).  To this end, the ALJ explained that she accorded "limited weight" to those findings because "they do not address claimant's functioning once adjusted to living in the shelter." R. 18.  This was error:  in light of the non-adversarial nature of a disability hearing, the ALJ should have sought clarification or additional information before (essentially) rejecting Dr. Pachas' findings.  See Sellan v. Astrue, 708 F.3d 409, 420 (2d Cir. 2013) ("To the extent [the] record is unclear, the Commissioner has an affirmative duty to fill any gaps in the administrative record before rejecting a treating physician's diagnosis." (internal quotation marks omitted)); Burgess v. Astrue, 537 F.3d 117, 129 (2d Cir. 2008) ("In light of the ALJ's duty to affirmatively develop the administrative record, an ALJ cannot reject a treating physician's diagnosis without first attempting to fill any clear gaps in the administrative record." (internal quotation marks omitted)); Vazquez v. Comm'r of Soc. Sec., No. 14 Civ. 6900, 2015 WL 4562978, at *17 (S.D.N.Y. July 21, 2015) (ALJ's rejection of treating psychiatrist's opinion "without first attempting to clarify any gaps or perceived inconsistencies in the record constituted legal error and grounds for remand"); Munoz v. Colvin, No. 13 Civ. 1269, 2014 WL 4449788, at *13 (S.D.N.Y. Sept. 10, 2014) ("In this Circuit, however, where, as here, the ALJ finds a treating physician's opinion lacking in support, he or she must seek additional information from the treating physician sua sponte before rejecting his or her opinion.").  Accordingly, I conclude and respectfully recommend that this matter be remanded to the Commissioner in accordance with the discussion above, for further development of the administrative record concerning Dr. Pachas' findings, followed by the proper application of the treating physician rule to consideration of Dr. Pachas' findings

regarding the nature and severity of plaintiff's impairments, and reconsideration of the weight assigned to Dr. Alexander's opinion.[25]

## VI.  CONCLUSION

For the reasons set forth above, I respectfully recommend that defendant's motion for judgment on the pleadings be **DENIED**, that plaintiff's motion for judgment on the pleadings be **GRANTED** and that the case be **REMANDED** for further administrative proceedings consistent with this Report & Recommendation pursuant to 42 U.S.C. § 405(g), sentence four.


Dated: January 20, 2016
         White Plains, New York

                              Respectfully submitted,



                              Paul E. Davison, U.S.M.J.

---

## NOTICE

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report and Recommendation to serve and file written objections.  See also Fed. R. Civ. P. 6(a).   Such objections, if any, along with any responses to the objections, shall be filed with the Clerk of the Court with extra copies delivered to the chambers of the Honorable Cathy Seibel, at the Honorable Charles L. Brieant, Jr. Federal Building and United States Courthouse, 300 Quarropas

---

[25] On remand, the ALJ may wish to make specific findings as to whether or not Dr. Pachas was, in fact, a "treating source."

Street, White Plains, New York 10601, and to the chambers of the undersigned at the same address.

Failure to file timely objections to this Report and Recommendation will preclude later appellate review of any order of judgment that will be entered.

Requests for extensions of time to file objections must be made to Judge Seibel.

-32-